J-S51025-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| RANDY TAFT | : | |
| | : | |
| Appellant | : | No. 399 MDA 2019 |

Appeal from the PCRA Order Entered February 18, 2019
In the Court of Common Pleas of Tioga County
Criminal Division at No(s):  CP-59-CR-0000152-1987

BEFORE:  PANELLA, P.J., GANTMAN, P.J.E., and MUSMANNO, J.

MEMORANDUM BY GANTMAN, P.J.E.:              **FILED SEPTEMBER 27, 2019**

Appellant, Randy Taft, appeals from the order entered in the Tioga County Court of Common Pleas, which denied his serial petition filed pursuant to the Post Conviction Relief Act ("PCRA").[1]  We affirm.

In its opinion, the PCRA court set forth the relevant facts of this case. Therefore, we have no reason to restate them.  Procedurally, on April 18, 1988, Appellant entered an open plea of *nolo contendere* to two counts of murder generally.  The court held a degree-of-guilt hearing that day, and found Appellant guilty of one count of first-degree murder and one count of third-degree murder.  The court sentenced Appellant to life imprisonment for the first-degree murder conviction, and imposed a consecutive 10-to-20 year

---

[1] 42 Pa.C.S.A. §§ 9541-9546.

sentence for the third-degree murder conviction. Appellant did not obtain direct review.

Between 1990 and 2012, Appellant unsuccessfully litigated multiple PCRA petitions. In 2014 and 2015, Appellant received two letters from the Department of Justice ("DOJ"), discussing a FBI investigation into the examiner who performed the hair analysis in Appellant's case and indicating the hair analysis in Appellant's case contained erroneous statements. Appellant filed the current, serial *pro se* PCRA petition on January 26, 2015, and amended counseled petitions on June 1, 2015 and August 24, 2015, claiming the DOJ letters constituted "newly-discovered facts." Appellant insisted he would have gone to trial if he had known the hair analysis contained erroneous statements and was inadmissible.

On October 20, 2015, the court issued notice of its intent to dismiss the petition without a hearing, per Pa.R.Crim.P. 907. The court dismissed the petition as untimely on January 29, 2016. This Court affirmed on October 13, 2017. **See Commonwealth v. Taft**, 179 A.3d 562 (Pa.Super. 2017). On March 21, 2018, our Supreme Court vacated and remanded for further consideration, in light of **Commonwealth v. Chmiel**, 643 Pa. 216, 173 A.3d 617 (2017) (holding FBI's concession of widespread error in microscopic hair analysis constituted newly-discovered fact and date of FBI's concession triggered statutory window to submit timely PCRA claim). **See Commonwealth v. Taft**, 645 Pa. 745, 182 A.3d 990 (2018) (*per curiam*).

On remand, this Court reversed the January 29, 2016 order denying PCRA relief and remanded for a hearing on the merits of Appellant's underlying after-discovered evidence claim. **See Commonwealth v. Taft**, 194 A.3d 686 (Pa.Super. 2018).

The court held a PCRA hearing on December 14, 2018. Appellant testified at the hearing, *inter alia*, that defense counsel told him the FBI had matched his hair sample with evidence collected at the crime scene and the Commonwealth was going to seek the death penalty. Appellant said defense counsel advised him to enter a plea of *nolo contendere* in light of the incriminating hair analysis evidence to avoid the possibility of the death penalty. Appellant claimed he would have probably gone to trial if he knew the hair analysis evidence was inadmissible. (**See** N.T. PCRA Hearing, 12/14/18, at 4-7; R.R. at 65a-68a). The Commonwealth did not present any witnesses. At the conclusion of the hearing, the court gave the parties the opportunity to file briefs.

Following briefing, the PCRA court denied relief on February 13, 2019. Appellant timely filed a notice of appeal on March 6, 2019. On March 22, 2019, the court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant complied.

Appellant raises one issue for our review:

> SHOULD [APPELLANT] BE PERMITTED TO WITHDRAW HIS PLEA OF *NOLO CONTENDERE* BECAUSE [OF] THE AFTER-DISCOVERED FACT THAT HAIR ANALYSIS EVIDENCE THAT WOULD HAVE BEEN PRESENTED AT TRIAL WAS

ERRONEOUS BECAUSE IT EXCEEDED THE LIMITS OF SCIENCE AND WAS THEREFORE INADMISSIBLE?

(Appellant's Brief at 2).

Our standard of review of the denial of a PCRA petition is limited to examining whether the record evidence supports the court's determination and whether the court's decision is free of legal error. *Commonwealth v. Ford*, 947 A.2d 1251 (Pa.Super. 2008), *appeal denied*, 598 Pa. 779, 959 A.2d 319 (2008). This Court grants great deference to the findings of the PCRA court if the record contains any support for those findings. *Commonwealth v. Boyd*, 923 A.2d 513 (Pa.Super. 2007), *appeal denied*, 593 Pa. 754, 932 A.2d 74 (2007). If the record supports a post-conviction court's credibility determination, it is binding on the appellate court. *Commonwealth v. Dennis*, 609 Pa. 442, 17 A.3d 297 (2011).

To obtain relief on a substantive after-discovered-evidence claim under the PCRA once jurisdiction is established, a petitioner must demonstrate: (1) the evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict. *Commonwealth v. Washington*, 592 Pa. 698, 927 A.2d 586 (2007). *See also Commonwealth v. Small*, ___ Pa. ___, 189 A.3d 961 (2018) (discussing quality of proposed "new evidence" and stating new evidence must be of higher grade or character than previously presented on material issue to support grant of new trial).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable John B. Leete, we conclude Appellant's issue merits no relief. The PCRA court opinion comprehensively discusses and properly disposes of the question presented. (*See* Opinion and Order on Amended PCRA Petition following Remand, filed February 13, 2019, at 7-8) (finding: Appellant's claim, that he would not have entered *nolo contendere* plea if he had known hair analysis used in his case was inadmissible, lacks merit; given vast evidence against Appellant demonstrated at his preliminary hearing and degree-of-guilt hearing immediately following plea, Appellant's decision to enter plea was based on all evidence Commonwealth had against Appellant, not just hair analysis evidence, which was only small part; Appellant failed to satisfy after-discovered evidence test to warrant PCRA relief). Accordingly, we affirm on the basis of the PCRA court's opinion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 09/27/2019

- 5 -

COMMONWEALTH OF
PENNSYLVANIA

Vs.

RANDY TAFT

:IN THE COURT OF COMMON PLEAS
:OF TIOGA COUNTY, PENNSYLVANIA   FILED
:                                   TIOGA COUNTY, PA
:No. 152 of 1987                  2019 FEB 13 AM 9: 43
:
:CRIMINAL DIVISION                  PROHOTARY &
                                  CLERK OF COURTS

## OPINION AND ORDER ON
## AMENDED PCRA PETITION FOLLOWING REMAND

Before the court is a matter remanded from the Superior Court pursuant to a memorandum opinion dated July 18, 2018. While that opinion did not deal with all of the information previously received by the defendant on the hair analysis going back many years, this court proceeded to schedule argument and testimony on that matter. Briefs were filed by both the Commonwealth and the defense relative to the validity of defendant's no contest pleas to two counts of murder, those peas being entered on April 18, 1988.

Defendant claims that the existence of the purported Malone hair comparison testimony caused him to enter his plea. As noted by the defense, that particular evidence, if offered, placed him at the scene and in the bedroom of the female victim. Further, defendant argues there was no recitation of the evidence against him since a plea was entered and no trial was held. He posits that he is entitled to a new trial for that reason. Defendant is not entirely correct. There was a preliminary hearing held in this case on May 6, 1987, for which defendant and his counsel were present and participated. In addition, the Commonwealth presented testimony and evidence to establish the degree of murder at hearing held on April 18, 1988. That hearing followed defendant's two no contest pleas to murder generally, with one victim being Sherry Russell and the other victim being her four-month-old son, David Russell.

1

The Commonwealth asserts the invalid hair comparison evidence was completely cumulative, thus rendering a new trial unnecessary. While the Commonwealth argues in its letter brief that evidence against the defendant was "overwhelming", and that there was "substantial physical and circumstantial evidence," the Commonwealth in the present matter failed to detail that evidence and its sources. As a result, the court has carefully reviewed the transcripts previously noted and will summarize the evidence offered against the defendant at both the preliminary hearing and the degree of guilt hearing following his plea.

A preliminary hearing was held before Magistrate Cunningham on May 6, 1987. It was established that the victims were discovered on April 10, 1987, at about 3 PM, and that they had last been seen alive on April 9, at approximately 11 PM. Referring to that transcript, Dr. James Wilson, Tioga County coroner, testified as to the location of a human bite mark on the female victim's clavicle area. (P.H. Tr. 4), along with various bruises contusions, stab marks, and lacerations found on her body. Extensive testimony was also taken regarding the whereabouts of defendant's car and the defendant himself, on both April 9 and 10th 1987. Much of this testimony was from Cora Flynn, defendant's aunt (P.H.Tr.6-10). Essentially defendant left a car at his aunt's home on April 9, and it was still there at 11 PM that night. The next morning Mrs. Flynn was awake at 5:30 AM and noticed that the defendant's car was gone. She went back to bed and awoke again close to 7 AM. She saw a car similar to the defendant's near her driveway although that car continued up the hill toward the home of the victims. While she did not see the defendant driving the car at that time, she identified the car as being a small white car with a loud muffler similar to defendant's vehicle. She watched the car go up the road and pull into an upper driveway where it sat for a minute then backed out and went up the road. Defendant and

2

his car were again seen by Mrs. Flynn at her home at approximately 11 AM on April 10 when defendant parked the car and went into town. It was noted that the car lacked a proper inspection sticker and had been previously parked at the Flynn residence from time to time. (P.H. Tr. 6-10).

Gerald Jeffers also testified at the preliminary hearing. He stated that as he was going to Elkland on April 10, 1987 at about 7 AM, he was nearly hit by a vehicle very similar to the defendant's as it pulled out of a driveway spinning tires. He felt defendant was trying to get out of the area of the murders, where defendant's car was seen. (P.H. Tr. 16-17).

According to the testimony given by Pennsylvania State Police Trooper Walushynsky, several searches were made on or about April 10 and 11, with the latter search being done pursuant to a search warrant. Included was a search for dental impressions of the defendant, which were made by a local dentist, Dr. Ronald Waclawik. (P.H.Tr. 22-23). The Trooper also testified that he observed a bite mark on the upper arm shoulder area of the female victim (P.H.Tr. 23). Impressions were compared by expert dentist Dr. Haskil Askings on or about April 15, 1987. Shortly thereafter, Dr. Askings filed a report indicating that the bite mark on the female victim had been made by the defendant. (P.H.Tr. 24).

Footprints at the scene were noted by the trooper, including sneaker prints inside the house on a diaper as well as prints outside the house near the bodies. Casts were made and sent to the FBI (P.H. Tr.25). Blood was also found on one of the defendant's sneakers which had been seized pursuant to a search. The tread patterns noted at the scene, among others, were similar to those of the defendant's sneakers (P.H. Tr. 26). The same officer noted a bruise on defendant's

3

neck, which defendant claimed came from a work-related injury at the rendering plant where he was employed (P.H.Tr. 26).

The female victim's brother-in-law had been at the trailer and took a shower in the early morning hours Friday, and some of his footprints were found in the area but not near the bodies (P.H. Tr.34-35). Among other prints found at the scene were boot prints similar to those owned by the defendant. (P.H. Tr.36)

Significant evidence was also presented to the court at the degree of guilt hearing held before the late Tioga County President Judge Robert Kemp on April 18, 2018. This hearing came immediately after defendant's no contest plea to two counts of murder. With reference to that trial transcript, in the course of the plea discussion, defendant's counsel William Hebe acknowledged on the record that the evidence was "overwhelmingly against" defendant, based upon counsel's own extensive investigation and testing (TR.13-14). In addition, various exhibits were offered into evidence. (Exhibits 125-130, 132-34,137). In the course of representing the defendant, defense counsel had vigorously pursued a variety of pretrial motions. Counsel sought psychiatric, psychological, and investigative assistance as well as a forensic dental expert and a pathologist. These motions can be found in the appellate court records filed with the Superior Court on Jan. 22, 1993, starting at page 52. Various sums of county money were made available to counsel to pursue all of these matters.

Trooper Witushynsky also testified on this at this later hearing. He had interviewed various individuals, including William Warner who was at the scene with the defendant and several other young people near the crime scene on April 9. (Tr.25). It was noted the defendant

4

lived approximately 5 miles from the crime scene. (Tr.26). Defendant acknowledged being in the area of the crime late at night on April 9. The trooper observed a mark on defendant's face on April 10. Defendant indicated that he had received it the evening before from a bar fight. Defendant further acknowledge being out on the evening of April 9, and that he had in fact parked his car at the Cora Flynn home across the road from his residence. He further indicated he had walked into town to a bar and returned home after having several drinks (TR. 27). Defendant explained that the upper part of a bruise on his face came for a pool cue during a bar fight on the evening of April 9. (TR.28). Another mark in the general area was found on defendant's neck, which defendant had not previously mentioned to the officer. The trooper sensed conflicts with defendant's explanations and investigated (TR.28-30).

Defendant's sneakers were located, and they had obviously been washed. A spot of what later proved to be human body was found on the tongue of one of his shoes. His sneakers were matched with the prints at the murder scene, after the sneakers were located at work where they were not typically kept. (TR.31-32). The defendant further acknowledged knowing the victim's husband, as well as that the victim 's husband worked away delivering hay outside of the area (TR.32). Further testimony indicated that the bite mark on victim Sherry Russell's body was identified as being from the defendant (TR.36).

Additional references were made to the testimony of Cora Flynn who indicated that the defendant's car was gone at 5 AM on April 10, but was back at about 6:45 when an individual, possibly the defendant, pulled out and headed south (TR. 37).

5

Witnesses at the bar where defendant was drinking on the evening of April 9 noticed no injuries on his body and were not aware of any fights or disturbances that evening while defendant was at the bar. Others saw him at the bar at about 11:30 PM. One of those witnesses described defendant as "acting like drugged out or something." Defendant left the bar between12:00 and 12:30 Am on April 10 (TR. 37-38).

A witness, Janice Hatch, informed the police that she had left work approximately 1 AM on April 10, and was driven home by the defendant's mother, Shirley Taft. Mrs. Taft reported that the defendant's car was at the victim's home when she passed by, with the defendant later claiming that he had stopped there to change a tire (TR. 39). The statement was reinforced by the defendant then he arrived home a few minutes after his mother in the early morning hours of April 10. He made specific reference to changing a tire while his car was at the Russell residence, and complained that his mother had not set stopped to assist when she passed by (TR. 40). A later examination of defendant's car showed no evidence of a flat tire or tires being changed. (TR. 41).

Footprint evidence linked a sneaker print found on a diaper in the house of the deceased to defendant (TR. 48). Reference was also made by Pennsylvania State Police Cpl. Patterson to the now discredited hair evidence matchup, as noted by the FBI, in the course of discussing the details of the sneaker prints. This was reflected by Commonwealth Exhibit 13 as well (TR.49). Further testimony from the same trooper indicated a match of the prints of defendant's cowboy boots with the boot print found at the scene. Specifically he said that the prints were similar in design and character. (TR.49). Finally, a spot of blood was found on defendant's car window.

6

Further inspection of defendant's spare tire indicated that it had not been moved nor were there any sign of any of the lug nuts on the car having been recently removed (TR. 52-53).

Against the backdrop of all this evidence including statements from the defendant's own mother placing him at the scene in the early morning hours of April 10, defendant continues to assert that his plea was induced by the discredited hair match evidence. That explanation defies both reason and is totally incredible given the evidence against the defendant and his own counsel's summary of that evidence. Defendant's decision to plea was obviously based on all the evidence in the case of which the hair match evidence was only a small part.

The ultimate question here is whether or not defendant can withdraw his nolo pleas and have a new trial. In order to obtain a new trial on after discovered evidence, he must establish by a fair preponderance of the evidence that the newly discovered evidence would likely bring about a different result. Com. v. Fisher, 870 A2d. 864 (Pa. 2005). In the Fisher case, the issue dealt with discredited expert testimony. Com. v. Burgess, 288 A2d 810 (Pa. 1972) is in accord. As pointed out by the Commonwealth, Burgess involved perjured testimony by a lab technician. The Supreme Court declined relief.

In order for the defendant to obtain relief on the basis of after-discovered evidence, various criteria must be met. Com. v. Rivera, 939 A2d 355, 359 (Pa. Super. 2007). For our purposes, that inquiry is limited to whether the newly discovered evidence, and the elimination of the proposed hair match testimony, would bring about a different result. Com. v. Heaster, 171 A3d 268 (Pa. Super.2017). Like Heaster, defendant's situation is unusual as he entered a plea and was sentenced long before the new evidence was discovered. To obtain relief, evidence that

7

tends to establish innocence must be presented, as opposed to simple impeachment evidence. Here the disputed evidence would not point to innocence, especially in view of all the other evidence against defendant. At most, it could have been used to impeach the FBI agent who did the hair comparisons. As such, the evidence does not exculpate defendant. <u>Com v. Fisher</u>, supra. This is in accordance with the applicable provision of the PCRA, section 9543 A2 (Vi).

While the Commonwealth persists in arguing that the present PCRA petition is untimely, that issue was dealt with by the Superior Court in its memorandum decision of July 18, 2018 and will not be discussed further.

Under all of the facts and circumstances presented, defendant has wholly failed to justify his position that he should be able to withdraw his pleas. An appropriate order follows.