**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 726 CAP |
| | : | |
| Appellee | : | Appeal from the Order dated May 2, |
| | : | 2016 in the Court of Common Pleas, |
| | : | Lackawanna County, Criminal Division |
| v. | : | at No. CP-35-CR-0000748-1983. |
| | : | |
| | : | SUBMITTED: January 30, 2017 |
| DAVID CHMIEL, | : | |
| | : | |
| Appellant | : | |


## OPINION


**JUSTICE WECHT**                                    **DECIDED: November 22, 2017**

In 2002, David Chmiel was convicted and sentenced to death for the murder of

three elderly siblings.[1]  At Chmiel's 2002 trial, the Commonwealth relied upon the

testimony of a state police forensic examiner, who opined that hair found at the crime

scene was microscopically similar to Chmiel's hair.  On April 20, 2015, the Federal

Bureau of Investigation ("FBI") issued a press release admitting, for the first time, that

testimony by FBI analysts regarding microscopic hair analysis in criminal trials was

---

[1]     This Court provided a thorough recitation of the facts underlying the judgment of
sentence on direct appeal, *Commonwealth v. Chmiel*, 889 A.2d 501, 509-13 (Pa. 2005)
("*Chmiel I*"), and in Chmiel's first appeal pursuant to the Post Conviction Relief Act
("PCRA"), 42 Pa.C.S. §§ 9541-46, *Commonwealth v. Chmiel*, 30 A.3d 1111, 1123-25
(Pa. 2011) ("*Chmiel II*").

erroneous in the vast majority of cases (hereinafter, "FBI press release").[2] The FBI further admitted that it had, over the course of twenty-five years, conducted multiple training courses for state and local forensic examiners throughout the country that incorporated some of the same flawed language that the FBI examiners had used in lab reports and trial testimony. Appendix C at 2.

On June 18, 2015, Chmiel filed a petition pursuant to the PCRA, asserting that his conviction and death sentence rested upon unreliable microscopic hair comparison evidence. Recognizing that his petition facially was untimely, Chmiel asserted that the FBI press release constituted a newly discovered fact that satisfied the timeliness exception set forth in Section 9545(b)(1)(ii).[3] The PCRA court rejected Chmiel's

---

[2] Press Release, FBI, *FBI Testimony on Microscopic Hair Analysis Contained Errors in at Least 90 Percent of Cases in Ongoing Review* (April 20, 2015), https://www.fbi.gov/news/pressrel/press-releases/fbi-testimony-on-microscopic-hair-analysis-contained-errors-in-at-least-90-percent-of-cases-in-ongoing-review; Appendix C to Initial Brief of Appellant (hereafter, "Appendix C").

[3] The PCRA's timeliness provisions provide, in relevant part:

(b) Time for filing petition.--

(1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:

> (i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;
> (ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or
> (iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of

(continued…)

reliance upon the FBI press release as a newly discovered fact, and dismissed the petition as untimely. We reverse, and we remand for further proceedings.

George Surma was a Pennsylvania State Police ("PSP") forensic scientist who testified for the Commonwealth at Chmiel's trial. At that time, Surma had been a forensic scientist with the PSP for twenty-seven years and had testified as an expert in forensic microscopy or electrophoresis on three to four hundred prior occasions. *Commonwealth v. Chmiel,* 30 A.3d 1111, 1137 (Pa. 2011) ("*Chmiel II*"); Notes of Testimony ("N.T."), 8/27/2002, at 5-6. Surma testified that he had received extensive training in the field of forensic science and had engaged in "advanced work in the analysis of blood, electrophoresis of blood and miscroscopy." *Id.* at 5.

Surma microscopically analyzed six hairs retrieved from a sweater sleeve mask that was found at the crime scene. This mask had been cut from a sweater and used to conceal the intruder's identity during the murders. *Commonwealth v. Chmiel*, 889 A.2d 501, 510 (Pa. 2005) ("*Chmiel I*"). The police were able to trace the sweater sleeve mask to Martin Chmiel, Chmiel's brother. *Id.* At trial, Surma testified that he used a comparison microscope to detect up to fourteen possible features of the cuticle, cortex, and medulla of the hair. *Chmiel II*, 30 A.3d at 1124; N.T., 8/27/2002, at 14-23. Surma subjectively selected these fourteen bases of comparison by considering "whatever

---

(…continued)

> Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

(2) Any petition invoking an exception provided in paragraph (1) shall be filed within 60 days of the date the claim could have been presented.

42 Pa.C.S. § 9545(b).

features or characteristics [he found] in that particular hair." *Id.* at 19. Surma did not explain how many features had to be similar to warrant a conclusion of microscopic similarity, or dissimilar to preclude such a conclusion. Nevertheless, Surma concluded that two hairs found on the sweater sleeve mask were "microscopically similar" to hair samples obtained from Chmiel, but not to those obtained from Chmiel's brother, Martin, or to the victims. *Chmiel II*, 30 A.3d at 1124; N.T., 8/27/2002, at 20, 26, 56.[4] The prosecutor exaggerated Surma's conclusions in his opening and closing statements, promising a "microscopic match," between Chmiel's hairs and those found at the crime scene, N.T., 8/19/2002, at 79, and arguing that Surma's testimony had established such a "match." N.T., 9/6/2002, at 175-77.

On March 21, 2007, Chmiel filed his first PCRA petition. Chmiel raised numerous claims, including a claim that trial counsel was ineffective for failing to challenge the admissibility of Surma's testimony pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), and for failing to obtain an expert witness to rebut Surma's testimony. *Chmiel II*, 30 A.3d at 1138. This Court found no merit to these ineffectiveness claims.

On June 18, 2015, Chmiel filed the present PCRA petition, asserting that his conviction and death sentence rested upon unreliable hair comparison evidence in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution. Chmiel also sought discovery from the Commonwealth pursuant to Pa.R.Crim.P. 902(E)(1).

---

[4] In addition, mitochondrial DNA analysis did not exclude Chmiel or Martin as sources of two of the hairs found on the sweater sleeve mask. N.T., 8/29/2002, at 165-67.

Recognizing that his petition was untimely on its face, Chmiel relied upon the timeliness exception for newly discovered facts, 42 Pa.C.S. § 9545(b)(1)(ii). Chmiel asserted that his claim was predicated upon the April 20, 2015 FBI press release, and that he could not previously have ascertained the facts contained therein by the exercise of due diligence. As support for his position that the press release revealed newly discovered facts, Chmiel relied upon an April 18, 2015 article in *The Washington Post* about the FBI press release. Chmiel filed his PCRA petition within sixty days of the FBI press release. *See* 42 Pa.C.S. § 9545(b)(2). Because the FBI press release and the *Washington Post* article describing the FBI's findings are the basis of Chmiel's attempt to overcome the PCRA's time restrictions, they warrant close review.

The FBI press release is entitled "FBI Testimony on Microscopic Hair Analysis Contained Errors in at Least 90 Percent of Cases in Ongoing Review." Appendix C at 1. In the press release, the FBI publicly disclosed the initial findings of an ongoing investigation undertaken jointly by the Department of Justice ("DOJ"), the FBI, the Innocence Project, and the National Association of Criminal Defense Lawyers ("NACDL"). The investigation scrutinized the testimony of FBI analysts concerning microscopic hair comparison analysis prior to 2000, the point at which mitochondrial DNA testing became routine in the FBI. The review was prompted by exonerations of three men who had been convicted, in part, based upon the scientifically flawed testimony of three FBI hair examiners. The review encompassed cases in which FBI microscopic hair comparison was used to link a defendant to a crime in both the federal and state systems. The FBI concluded that its examiners' testimony in at least 90% of cases contained erroneous statements. The FBI's findings "confirm[ed] that the FBI

microscopic hair analysts committed widespread, systematic error, grossly exaggerating the significance of their data under oath with the consequence of unfairly bolstering the prosecution's case. . . ." Appendix C at 1.

The FBI press release quoted Peter Neufeld, co-director of the Innocence Project, as saying that the results of the FBI's review demonstrated an "epic miscarriage of justice." *Id.* The press release also quoted Norman L. Reimer, Executive Director of NACDL, as stating that, although "[i]t will be many months before we can know how many people were wrongly convicted based on this flawed evidence," he was certain that there were "many whose liberty was deprived and lives destroyed by prosecutorial reliance on this flawed, albeit highly persuasive evidence." *Id.* Mr. Reimer called upon lawmakers to prevent similar systemic failures, and upon the courts to "give those who were impacted by this evidence a second look at their convictions." *Id.* The FBI committed to "address[ing] errors made in statements by FBI examiners regarding microscopic hair analysis in the context of testimony and laboratory reports." *Id.*

The FBI press release also described the FBI's efforts to train state and local hair examiners in such "invalid" and "faulty" evidence:

> Over the course of 25 years, the FBI conducted multiple two-week training courses that reached several hundred state and local hair examiners throughout the country and that incorporated some of the same scientifically flawed language that the FBI's examiners had used in some lab reports and often in trial testimony. In response to the FBI/DOJ review, the Texas Forensic Scientific Commission has already begun a review of cases handled by analysts at state and local crime labs. Similar audits are needed in most other states.

*Id.* at 2. The press release stated that the FBI's review did not include cases in which hair comparison was conducted by state and local crime labs. The findings prompted

the FBI to commit to "[s]trongly encourag[ing] the states again to conduct their own independent reviews where its examiners were trained by the FBI." *Id.*

The April 18, 2015 edition of *The Washington Post* reported upon the FBI's findings in an article entitled "*FBI admits flaws in hair analysis over decades.*" *See* Appendix B.[5] The article reported that the FBI and DOJ formally had acknowledged that "nearly every examiner in an elite FBI forensic unit gave flawed testimony in almost all trials in which they offered evidence against criminal defendants over more than a two-decade period before 2000." *Id.* at 1. *The Washington Post* quoted legal analysts as characterizing the FBI's review as "a watershed in one of the country's largest forensic scandals, highlighting the failure of the nation's courts for decades to keep bogus scientific information from juries. . . ." *Id.* The questions following the FBI's review, according to the article, included how the courts will respond to findings that "confirm long-suspected problems with subjective, pattern-based forensic techniques— like hair and bite-mark comparisons—that have contributed to wrongful convictions in more than one-quarter of 329 DNA-exoneration cases since 1989." *Id.* The article indicated that, although "unnamed federal officials previously acknowledged widespread problems, the FBI until now has withheld comment because findings might not be representative." *Id.* at 2.

The *Washington Post* article explained that, until 2012, hair examiners lacked written standards defining scientifically accurate ways to explain hair analysis results in

---

[5] *See also* Spencer S. Hsu, *FBI admits flaws in hair analysis over decades*, *The Washington Post* (April 18, 2015), https://www.washingtonpost.com/local/crime/fbi-overstated-forensic-hair-matches-in-nearly-all-criminal-trials-for-decades/2015/04/18/39c8d8c6-e515-11e4-b510-962fcfabc310_story.html.

court. Prior to such standards, FBI hair analysts routinely testified to the "near-certainty of 'matches' of crime scene hairs," *id.* at 2, supporting their conclusions with incomplete or misleading statistics. *Id.* In truth, there was no accepted research on the frequency with which hair from different individuals may appear the same. According to the article, warnings about the problems with hair analysis had been mounting since 2002, when the FBI reported that its own DNA testing revealed that examiners reported false hair matches 11% of the time. *Id.* at 3. Like the FBI press release, the article reported that "the same FBI examiners whose work is under review taught 500 to 1,000 state and local crime lab analysts to testify in the same ways." *Id.* at 3-4.

Relying upon the FBI press release to satisfy the PCRA's newly discovered facts exception, Chmiel asserted in his petition that Surma was trained by the FBI and provided the same scientifically unsupportable testimony that the FBI now disclaims, linking the hairs recovered from the sweater sleeve mask to Chmiel, while also excluding Martin Chmiel. In tandem with his PCRA petition, Chmiel sought discovery pursuant to Rule 902(E)(1), which provides that "no discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing of exceptional circumstances." Pa.R.Crim.P. 902(E)(1). Chmiel asserted that he had established exceptional circumstances to depose Surma, to take discovery regarding every other case in which Surma had testified, and to obtain documentary evidence in the FBI's possession regarding the FBI's internal review of the use of hair comparison evidence.

The PCRA court dismissed Chmiel's PCRA petition as untimely. According to the PCRA court, our decision in *Commonwealth v. Edmiston*, 65 A.3d 339 (Pa. 2013), controlled the timeliness inquiry. *Edmiston* involved a PCRA petition filed by a capital

defendant who, like Chmiel, was convicted following the introduction of hair comparison analysis testimony at trial. On February 18, 2009, the National Academy of Sciences published a report entitled "Strengthening Forensic Science in the United States: A Path Forward" (hereinafter, "the NAS Report"). The NAS Report was a review of prior studies and articles, as well as the National Academy of Sciences' conclusion that "there was no scientific support for the use of microscopic hair analysis for individualization that is not accompanied by mitochondrial DNA analysis." *Edmiston*, 65 A.3d at 351.

On April 17, 2009, Edmiston raised a facially untimely claim for post-conviction relief premised upon the NAS Report. *Edmiston*, 65 A.3d at 344. Edmiston relied upon the NAS Report in attempting to establish the newly discovered fact exception to the one-year time bar. *Edmiston,* 65 A.3d at 350-51; 42 Pa.C.S. § 9545(b)(1)(ii). Edmiston asserted that the NAS Report was a newly discovered fact that supported his claim of actual innocence, because it demonstrated that the Commonwealth's hair analysis evidence was "false, misleading, and unreliable." *Edmiston*, 65 A.3d at 351.

On appeal from the PCRA court's dismissal of Edmiston's petition as untimely, this Court addressed the applicability of the newly discovered facts exception to the PCRA's jurisdictional time restrictions. *See* 42 Pa.C.S. § 9545(b)(1)(ii). We observed that, "to constitute facts which were unknown to a petitioner and could not have been ascertained by the exercise of due diligence, the information must not be of public record and must not be facts that were previously known but are now presented through

a newly discovered source." *Edmiston*, 65 A.3d at 352.[6] Evaluating Edmiston's reliance upon the NAS Report as a newly discovered fact, this Court explained that "the 'fact' [that Edmiston] relies upon as newly discovered is not the publication of the NAS Report, but the analysis of the scientific principles supporting hair comparison analysis." *Id.* This Court held that the "fact" contained within the NAS Report was not new, as questions about the reliability of hair comparison analysis had existed in various sources prior to publication of the NAS Report: "Specifically, the NAS Report refers to various studies and reports published in the public domain as early as 1974 and as recently as 2007. As such, the information relied upon by [Edmiston] in the Report constitutes facts that were in the public domain and could have been discovered by [Edmiston] through the exercise of due diligence prior to the filing of his . . . Petition." *Edmiston*, 65 A.3d at 352. This analysis led the Court to conclude that the NAS Report failed to satisfy the timeliness exception for newly discovered facts.

In the instant case, the PCRA court analogized the FBI press release to the NAS Report in *Edmiston*, reasoning that the information contained within the FBI press release was available in the public domain prior to 2015, and that Chmiel could have discovered it through the exercise of due diligence more than sixty days prior to filing the PCRA petition on June 18, 2015. In particular, the PCRA court relied upon an article from the *Washington Post* dated April 16, 2012, reporting that the DOJ had begun to review internally numerous cases after reports that sloppy work by FBI

---

[6] We recently held that "the presumption that information which is of public record cannot be deemed 'unknown' for purposes of subsection 9545(b)(1)(ii) does not apply to *pro se* prisoner petitioners." *Commonwealth v. Burton*, ___ A.3d ___, 2017 WL 1149203, at *16 (Pa. 2017).

forensic examiners were producing unreliable hair comparison evidence at trials. PCRA Court Opinion at 28-29. The article reported that the DOJ had disclosed the results of the review to the defendants in fewer than half of approximately "250-plus questioned cases" included in the review. *Id.* at 29. On July 10, 2012, the *Washington Post* confirmed that the DOJ and FBI had launched a review of thousands of criminal cases that included microscopic hair examination by the FBI. On July 29, 2014, the *Washington Post* reported that the DOJ and the FBI were in the midst of their internal review, that most of the cases under review included flawed forensic testimony from the FBI, and that the DOJ had begun to notify affected defendants. *Id.* at 30-31.

Assuming, *arguendo,* that the FBI press release satisfied the timeliness exception for newly discovered facts, the PCRA court held that Chmiel was not entitled to relief because his claim was previously litigated. *See* 42 Pa.C.S. § 9544(a)(3). According to the PCRA court, Chmiel already had challenged the scientific validity of Surma's hair comparison evidence and methodology in his prior PCRA petition, when he raised a claim of counsel ineffectiveness for failing to move for exclusion of such evidence pursuant to *Frye,* and for failing to hire an expert to counter Surma's testimony. Finally, the PCRA court held that Chmiel had failed to establish exceptional circumstances to warrant discovery pursuant to Rule 902(E)(1).

We have exclusive jurisdiction over appeals of determinations made in death penalty cases. 42 Pa.C.S. § 722(4); 42 Pa.C.S. § 9546(d). "Our review of a PCRA court's decision is limited to examining whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error." *Commonwealth v. Koehler*, 36 A.3d 121, 131 (Pa. 2012). Our review of questions of

law is *de novo*. *Commonwealth v. Fahy*, 959 A.2d 312, 316 (Pa. 2008). Our scope of review is limited to the PCRA court's findings and the evidence of record, viewed in the light most favorable to the Commonwealth as the prevailing party. *Id.*

To be eligible for post-conviction relief, a petitioner must prove by a preponderance of the evidence that his conviction or sentence resulted from one of several enumerated circumstances, *see* 42 Pa.C.S. § 9543(a)(2), and that the issues have not been previously litigated or waived, *id.* § 9543(a)(3). "A PCRA petition, including a second or subsequent petition, must be filed within one year of a final judgment, unless the petitioner alleges and proves that he is entitled to one of three exceptions to this general rule, and that the petition was filed within 60 days of the date the claim could have been presented." *Edmiston*, 65 A.3d at 345; 42 Pa.C.S. § 9545(b). This is a jurisdictional limitation. *Commonwealth v. Bennet*, 930 A.2d 1264, 1267 (Pa. 2007).

As noted, Chmiel relies upon the timeliness exception for newly discovered facts. *See* 42 Pa.C.S. § 9545(b)(1)(ii). This exception "requires that the 'facts' upon which such a claim is predicated must not have been known to appellant, nor could they have been ascertained by due diligence." *Commonwealth v. Lambert*, 884 A.2d 848, 852 (Pa. 2005). As this Court explained in *Edmiston*, to fall within this exception, the factual predicate of the claim "must not be of public record and must not be facts that were previously known but are now presented through a newly discovered source." *Edmiston*, 65 A.3d at 352.

The PCRA court narrowly construed the newly discovered facts exception in holding that the underlying information contained in the FBI press release was simply

confirmation of information that was already available in the public domain. In this conclusion, the PCRA court erred.

There are two newly discovered facts upon which Chmiel's underlying claim is predicated, both of which were made public for the first time in the *Washington Post* article and the FBI press release. First, the FBI publicly admitted that the testimony and statements provided by its analysts about microscopic hair comparison analysis were erroneous in the vast majority of cases. The FBI's revelation reverberated throughout the country, marking a "watershed in one of the country's largest forensic scandals," *see* Appendix B at 1, precisely because it constituted a public admission by the government agency that had propounded the widespread use of such scientifically flawed testimony. The revelation was the first time the FBI acknowledged that its microscopic hair analysts committed widespread, systemic error by grossly exaggerating the significance of their data in criminal trials. The *Washington Post* article acknowledged the novelty of the FBI's disclosures: "While unnamed federal officials previously acknowledged widespread problems, the FBI until now has withheld comment because findings might not be representative." *See* Appendix B at 2. Second, the FBI press release included the revelation that the FBI had trained many state and local analysts to provide the same scientifically flawed opinions in state criminal trials.

With these newly discovered, material facts, the FBI press release indicates that Surma's trial testimony may have exceeded the limits of science and overstated to the jury the significance of the microscopic hair analysis. Surma used microscopic hair analysis in an attempt to link Chmiel to the crime. The FBI now has publicly repudiated the use of microscopic hair analysis to "link a criminal defendant to a crime." *See*

Appendix C at 1. The FBI's repudiation and disclosure about its role in training state and local forensic examiners satisfies Section 9545(b)(1)(ii), and entitles Chmiel to a merits determination of his underlying claim.[7]

Contrary to the PCRA court's opinion and the dissenting opinion by Justice Mundy, *see* Dissenting Opinion at 3, the fact that the FBI was internally reviewing the accuracy of microscopic hair analysis or testimony is not the newly discovered fact upon which Chmiel's claim is based. Rather, the newly discovered facts are the FBI's admissions, as the proponent of microscopic hair analysis, that its examiners gave flawed and scientifically unsupportable testimony, and spread its flawed methodology to state and local analysts. Although the existence of the FBI's internal investigation was known, the press release marked the first public admission by the FBI regarding its conclusions about testimony premised upon microscopic hair analysis and the dispersion of such scientifically flawed language to state and local analysts.

---

[7] To the extent Chief Justice Saylor believes that Surma's testimony may in fact not have constituted the type of junk science that the FBI now has repudiated, *see* Concurring Opinion at 1-2, those considerations go to the merits of the underlying issue rather than to the timeliness of the PCRA petition. *See* Concurring Opinion at 3*; Commonwealth v. Bennett*, 930 A.2d 1264, 1271 (Pa. 2007) ("the exception set forth in subsection (b)(1)(ii) does not require any merits analysis of the underlying claim.").

We disagree with Justice Mundy's position that Chmiel must, at this juncture, demonstrate a more "direct connection" between the FBI press release and his underlying claim. *See* Dissenting Opinion at 4. Chmiel's underlying claim is that his conviction rests upon unreliable hair comparison evidence in violation of the United States and Pennsylvania Constitutions. Pursuant to *Bennett*, all that Chmiel must demonstrate is that "1) 'the facts upon which the claim was predicated were unknown' and 2) 'could not have been ascertained by the exercise of due diligence.'" *Bennett*, 930 A.2d at 1272 (citing 42 Pa.C.S. § 9545(b)(1)(ii)). As explained above, Chmiel's claim is predicated upon the newly discovered facts contained within the FBI press release. Such facts could not have been ascertained by the exercise of due diligence prior to the issuance of the FBI press release.

Moreover, this Court's analysis of the NAS Report in *Edmiston* does not control the timeliness of Chmiel's second PCRA petition. With respect to hair analysis, "the [NAS] Report reviewed prior studies and articles to conclude that there was no scientific support for the use of microscopic hair analysis for individualization that is not accompanied by mitochondrial DNA analysis." *Edmiston*, 65 A.3d at 351. This Court concluded that the facts proffered in the NAS Report were not new, and had existed in various sources prior to publication of the report.

Although the NAS Report compiled preexisting public data and studies and questioned the science underlying microscopic hair analysis, it unquestionably was not an admission by the authority behind the science that the science and related testimony were, in fact, flawed. In contrast, the FBI press release is not old wine in a new bottle, *see* Appellant's Brief at 17; it was a public admission by the FBI, as the nation's premier law enforcement agency and the proponent of this forensic technique, of widespread error. It is this concession, not the suspected unreliability of the forensic evidence as developed through scientific advancements, that triggers the sixty-day window within which Chmiel was required to file his claim. This concession did not exist in the public domain prior to April 20, 2015.

The accepted understanding in the forensic science community of microscopic hair comparison analysis has shifted since Chmiel's conviction. This shift in understanding reveals a recognition of the flawed scientific premise that microscopic hair comparison could be used definitively to link a criminal defendant to a crime. Although the scientific foundation of such conclusory assertions was called into question beginning as early as 1974, *Edmiston*, 65 A.3d at 352, and continually thereafter, this

substantial shift in understanding was not embraced or acknowledged by the FBI until it went public with the preliminary results of its independent review. Scientific breakthroughs in rejecting the ability of a forensic hair analyst to opine about statistical significance, or to link a defendant to a crime, reached a tipping point with the 2009 NAS Report. At that time, however, the FBI remained silent on the reliability of what it now concedes is "invalid," "flawed," and "faulty" evidence. *See* Appendix C at 1-2. The FBI's view in April 2015 stands in sharp contrast to its flawed understanding of the significance of microscopic hair comparison analysis in the early 2000s.

Nor are Chmiel's claims previously litigated, as the PCRA court held. Section 9543(a)(3) of the PCRA provides that "an issue" has been previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." 42 Pa.C.S. § 9544(a)(2); *Commonwealth v. Beasley*, 678 A.2d 773, 778 (Pa. 1986). In this context, "issue" is "the discrete legal ground" that was forwarded to the highest appellate court and which would have entitled the defendant to relief. *Commonwealth v. Collins*, 888 A.2d 564, 570 (Pa. 2005). Although there can be many theories and allegations in support of a single issue, Section 9544 refers to the discrete legal ground already raised and decided. *Id.* An issue is not previously litigated when it does not rely solely upon previously litigated evidence. *Commonwealth v. Miller*, 746 A.2d 592, 602 n.9 & 10 (Pa. 2000).

In his first PCRA petition, Chmiel argued that his counsel was ineffective for failing to challenge the admissibility of Surma's testimony pursuant to *Frye*, and for failing to rebut Surma's testimony with an expert witness. *Chmiel II*, 30 A.3d at 1138. In support of this claim, Chmiel presented a forensic chemical microscopist, Samuel

James Palenik. Palenik testified that, although microscopic hair analysis has value as an investigative tool, it cannot be used for positive identification. *Id.* at 1139. Palenik also testified about the flaws in Surma's procedures. For example, Palenik testified that Surma's findings were not verified by an independent microscopist as was required by the industry guidelines that were in existence at the time of Chmiel's trial. Chmiel also supported his claim by relying upon a series of forensic science journals, law review articles, and newspaper reports disputing the accuracy of hair comparison evidence. Chmiel included an FBI study comparing microscopic hair analysis to mitochondrial DNA analysis, and identifying error rates for microscopic hair analysis.

The *Frye* test is essentially a test for the admissibility of novel science, providing that the "[a]dmissibility of [ ] scientific evidence depends upon the general acceptance of its validity by those scientists active in the field to which the evidence belongs." *Commonwealth v. Dengler*, 890 A.2d 372, 381 (Pa. 2005) (quoting *Commonwealth v. Topa*, 369 A.2d 1277, 1281 (Pa. 1977)). Chmiel's prior post-conviction attack on the Commonwealth's hair analysis evidence was a challenge to the admissibility of the science of hair microscopy, and to counsel's failure to challenge the admissibility on this basis. *Chmiel II*, 30 A.3d at 1141. In rejecting his ineffectiveness claim, this Court observed that "many jurisdictions [ ], prior to [Chmiel's] 2002 trial, had determined that human hair analysis by microscopical comparison is an accepted and reliable scientific method or technique." *Chmiel II,* 30 A.3d at 1141. We were careful not to "discredit the notion . . . that a once-viable science may lose its wide acceptance in the scientific community . . . ." *Chmiel II*, 30 A.3d at 1142. Our rejection of Chmiel's claim was premised upon the lack of support for his view that, at the time of his 2002 trial, forensic

hair microscopy was no longer an accepted science. *Id.* Indeed, at the time of Chmiel's 2008 PCRA hearing, Palenik relied upon the same scientific methodology as did Surma to testify that hair microscopy was a recognized science to which a "minimal reserve of experts . . . exists who can critically examine the validity of a scientific determination in a particular case." *Id.* (quoting *Dengler*, 890 A.2d at 381 (describing one of the principal concerns of *Frye*)). We found no merit to Chmiel's *Frye*-based ineffectiveness claim.

Chmiel's current claim is premised upon the fact that, since the FBI's April 20, 2015 admission, microscopic hair analysis no longer is considered to be scientifically reliable. This issue does not rest upon the evidence and arguments made in Chmiel's prior PCRA ineffectiveness claim. Chmiel's prior PCRA claim and the current claim are premised upon discrete legal grounds. *See Collins*, 888 A.2d at 570. The current claim is not previously litigated.

Accordingly, the information contained within the FBI's press release did not exist in the public domain prior to publication of the press release. The FBI's concessions in its press release triggered the sixty-day window within which Chmiel had to file his petition. *See* 42 Pa.C.S. § 9545(b)(2). Chmiel filed his petition within sixty days, on June 18, 2015. Accordingly, we reverse the order of the PCRA court dismissing Chmiel's petition as untimely and previously litigated, and we remand for further proceedings.[8]

---

[8] The PCRA court denied Chmiel's request for discovery to ascertain whether Surma was trained by the FBI based upon its ruling that the underlying claim was time-barred. To the extent this question is necessary to resolve the merits of Chmiel's underlying claim, the PCRA court should reconsider the discovery request in light of our timeliness conclusion.

Justices Todd, Donohue and Dougherty join the opinion.

Chief Justice Saylor files a concurring opinion in which Justice Baer joins.

Justice Donohue files a concurring opinion.

Justice Mundy files a dissenting opinion.