J-S22038-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                                             :         PENNSYLVANIA
                                :
             v.                       :
                                :
                                :
JAMES C. YOUNG                     :
                                :
            Appellant        :   No. 901 WDA 2022

Appeal from the PCRA Order Entered July 26, 2022
In the Court of Common Pleas of Westmoreland County
Criminal Division at CP-65-CR-0000627-1994

BEFORE:  OLSON, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:         **FILED: August 16, 2023**

James C. Young (Appellant) appeals from the order denying as untimely his petition for relief filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546.  After careful consideration, we conclude Appellant has met the newly-discovered facts exception to the PCRA's time-bar.  Accordingly, we vacate the order and remand for further proceedings.

<u>Procedural History</u>

Appellant has been incarcerated for nearly 30 years.  The PCRA court explained:

> On June 9, 1993, a fire erupted at [Appellant]'s residence in Jeannette, Pennsylvania, Westmoreland County, resulting in the death of [Appellant]'s wife and two minor children. … [A] Criminal Complaint was filed against [Appellant] on February 24, 1994. [Appellant] was charged as follows:
>
> 1.)    Count One: Criminal Homicide, in violation of 18 Pa.C.S.A. § 2501(a); and

    2.)    Count Two: Arson, in violation of 18 Pa.C.S.A. § 3301(a)(2)

        Pursuant to these charges, [Appellant] elected to proceed to a jury trial maintaining his innocence. On October 10, 1995, at the conclusion of [Appellant's] trial, he was found guilty of the relevant charges and was subsequently sentenced to three consecutive life sentences without the possibility of parole ….

PCRA Court Opinion, 7/26/22, at 1-2.

Appellant filed a direct appeal. This Court affirmed the judgment of sentence and the Pennsylvania Supreme Court denied allowance of appeal. **Commonwealth v. Young**, No. 592 PGH 1996 (Pa. Super. Jan. 24, 1997) (unpublished memorandum), **appeal denied**, No. 123 WAL 1997 (Pa. Oct. 17, 1997).

In October 1998, Appellant filed a timely first PCRA petition. The PCRA court denied relief on May 8, 2000, and this Court affirmed. **Commonwealth v. Young**, No. 976 WDA 2000 (Pa. Super. May 29, 2001) (unpublished memorandum), **appeal denied**, No. 364 WAL 2001 (Pa. Oct. 31, 2001).

Appellant *pro se* filed a second PCRA petition in January 2002. Appellant sought relief based on changes to the *NFPA 921: Guide for Fire and Explosion Investigations, National Fire Protection Association* (NFPA 921).[1] This Court

---

[1] In 2017, this Court explained:

    The NFPA 921 is a guide for "scientific-based investigation and analysis of fire and explosion incidents … [and] the foremost guide for rendering accurate opinions as to incident origin, cause, responsibility, and prevention." NFPA 921 covers "[a]ll aspects of

*(Footnote Continued Next Page)*

has described the NFPA 921 as "the foremost guide for rendering accurate opinions as to [fire] incident origin, cause, responsibility, and prevention." *Commonwealth v. Smallwood*, 155 A.3d 1054, 1059 n.5 (Pa. Super. 2017). Appellant also requested appointment of counsel. The PCRA court declined to appoint counsel, and dismissed the petition without a hearing on February 25, 2002. Appellant filed a *pro se* appeal, and this Court affirmed. *Commonwealth v. Young*, No. 615 WDA 2002 (Pa. Super. July 7, 2003) (unpublished memorandum). Appellant did not seek allowance of appeal.

With the assistance of counsel, Appellant filed the instant PCRA petition, his third, on February 21, 2017.[2] Appellant filed an amended PCRA petition

---

fire and explosion investigation … from basic methodology to collecting evidence to failure analysis. Guidelines apply to all types of incidents from residential fires and motor vehicle fires to management of complex investigations such as highrise fires and industrial plant explosions." The purpose of NFPA 921 is "to assist individuals who are charged with the responsibility of investigating and analyzing fire and explosion incidents and rendering opinions as to the origin, cause, responsibility, or prevention of such incidents, and the damage and injuries which arise from such incidents." *NFPA 921: Guide for Fire and Explosion Investigators, National Fire Protection Association*, http://www.nfpa.org/codes-and-standards/all-codes-and-standards/list-of-codes-and-standards?mode=code&code=921 (last visited Jan. 17, 2017).

*Commonwealth v. Smallwood*, 155 A.3d 1054, 1058 (Pa. Super. 2017).

[2] On January 26, 2018, Appellant filed a habeas petition with the United States District Court for the Western District of Pennsylvania. *See* Appellant's Brief at 9. The District Court granted Appellant's motion to have his federal habeas petition stayed pending the exhaustion of his state court remedies. *Id.*

on February 2, 2021. Our disposition is based on the amended petition, in which Appellant asserts newly-discovered facts as an exception to the PCRA's time-bar. *See* 42 Pa.C.S.A. § 9545(b)(1)(ii). Appellant bases his claim on: (a) changes to the 2021 edition of the NFPA 921; and (b) Dr. Craig Beyler's January 26, 2021, supplemental expert report discussing the 2021 changes.

The PCRA court conducted an evidentiary hearing on October 25, 2021. Appellant testified and presented testimony from his expert, Dr. Beyler. The Commonwealth did not present any witnesses. On July 26, 2022, the PCRA court issued an opinion concluding that Appellant failed to establish newly-discovered facts, and an order denying Appellant's petition. Appellant filed this timely appeal.

<u>Issues & Standard of Review</u>

Appellant presents the following issues for review:

1. Whether the PCRA court erred in concluding [Appellant's] petition was untimely because he did not meet the new facts exception to the PCRA's time bar?

2. Whether the PCRA's timing provisions are unconstitutionally void for vagueness as applied to cases based on evolving science?

3. Whether *Commonwealth v. Peterkin*, 722 A.2d 638 (Pa. 1998), was wrongly decided?

4. Whether the Pennsylvania Supreme Court should revisit its holding in *Commonwealth v. Edmiston*, 65 A.3d 339 (Pa. 2013), which has been interpreted to hold that expert opinions applying evolving science to the facts of a case do not constitute a new fact for PCRA purposes?

Appellant's Brief at 4.

- 4 -

This Court's "standard of review of a PCRA court order is whether the determination of the PCRA court is supported by the evidence of record and is free of legal error." **Commonwealth v. Hipps**, 274 A.3d 1263, 1266 (Pa. Super. 2022) (citation omitted). We are "limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party." **Commonwealth v. Howard**, 285 A.3d 652, 657 (Pa. Super. 2022) (citations omitted). However, we apply a *de novo* standard of review to the PCRA court's legal conclusions. **Id.**

A PCRA petition must be filed within one year of the petitioner's judgment of sentence becoming final. 42 Pa.C.S.A. § 9545(b)(1). "A judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of the time for seeking the review." 42 Pa.C.S.A. § 9545(b)(3). The timeliness of a PCRA petition is jurisdictional. If a PCRA petition is untimely, the court lacks jurisdiction. **Commonwealth v. Wharton**, 886 A.2d 1120, 1124 (Pa. 2005).

Discussion

It is undisputed that Appellant's PCRA petition is facially untimely. The issue is whether Appellant established the newly-discovered facts exception pursuant to Section 9545(b)(1)(ii).

The PCRA's one-year time restriction may be overcome if a petitioner (1) alleges and proves one of the exceptions in Section 9545(b)(1)(i)-(iii) of

- 5 -

the PCRA, and (2) files a petition raising this exception within one year of the date the claim could have been presented. *See* 42 Pa.C.S.A. § 9545(b)(2). "To qualify for an exception to the PCRA's time limitations under subsection 9545(b)(1)(ii), a petitioner need only establish that the facts upon which the claim is based were unknown to him and could not have been ascertained by the exercise of due diligence." *Commonwealth v. Burton*, 158 A.3d 618, 629 (Pa. 2017). "The focus of this exception is on the newly discovered facts, not on a newly discovered or newly willing source for previously known facts." *Commonwealth v. Marshall*, 947 A.2d 714, 720 (Pa. 2008).

"The law does not require a 'nexus' between the newly-discovered facts and the conviction or sentence for purposes of satisfying the timeliness exception requirements of the PCRA." *Commonwealth v. Blakeney*, 193 A.3d 350, 362 (Pa. 2018). It bears repeating that the exception, "by its express terms, requires only that the petitioner plead and prove that the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence." *Commonwealth v. Small*, 238 A.3d 1267, 1286 (Pa. 2020) (citation omitted).[3] Thus, an

---

[3] In this decision, we cite two Pennsylvania Supreme Court cases captioned "*Commonwealth v. Small*." *See Commonwealth v. Small*, 238 A.3d 1267 (Pa. 2020) (*Elwood Small*), and *Commonwealth v. Small*, 189 A.3d 961 (Pa. 2018) (*Eric Eugene Small*). Both cases involve appeals of a PCRA petitioner/appellant but are otherwise unrelated. In *Elwood Small*, the Supreme Court concluded the "assertion of newly discovered facts is not
*(Footnote Continued Next Page)*

- 6 -

exception to the time-bar "does not require any merits analysis of the underlying claim[.]" *Id.* (citation omitted). The Supreme Court observed:

> [T]he PCRA "provides for an action by which persons convicted of crimes they did not commit and persons serving illegal sentences may obtain collateral relief." 42 Pa.C.S. § 9542. The PCRA provides a mechanism to *obtain* collateral relief; finality of a judgment is merely a consequence of the denial of such relief. In any event, … "we must construe the provisions of the PCRA liberally 'to effect their objects and to promote justice.'" *Bennett*, 930 A.2d at 1270 (quoting 1 Pa.C.S. § 1928(c)).

*Id.* at 1285 (italics in original).

Mindful of the foregoing authority, we consider Appellant's first issue. Appellant argues the PCRA court erred in rejecting his claim that changes to the 2021 edition of the NFPA 921 constituted newly-discovered facts. Appellant's Brief at 39. Appellant asserts that he "presented significant new scientific information—particularly about fire pattern analysis, canine accelerant detection, and hypothesis development, that was not available even at the time of his initial 2017 petition, much less at his 1995 trial or during the 1993 fire investigation." *Id.* at 48. Appellant states, "the [2021] edition [of the NFPA 921,] upon which [Dr. Beyler's] 2021 supplemental report

_____

foreclosed pursuant to a categorical presumption regarding matters of public record." *Elwood Small*, 238 A.3d at 1271. In *Eric Eugene Small*, the Supreme Court held that a claim of after-discovered evidence "is not 'merely' corroborative or cumulative … [i]f the new evidence is of a different and 'higher' grade or character, though upon the same point …." *Eric Eugene Small*, 189 A.3d at 974.

and [Appellant's] 2021 amendment are based, provides some of 'the most significant changes in fire investigation since the original development of 921.'" *Id.* (citing N.T. 10/25/21, at 93).

Appellant argues the PCRA court improperly disregarded the Supreme Court's holding in ***Commonwealth v. Small***, 189 A.3d 961 (Pa. 2018). *Id.* at 39-40. He maintains:

> If the new evidence is of a different and "higher" grade or character, though upon the same point, or of the same grade or character on a different point, it is not "merely" corroborative or cumulative, and may support the grant of a new trial based on after-discovered evidence. This definition of merely corroborative or cumulative evidence accounts for *the reality that not all evidence relating to the same material point is equal in quality, or "grade."*

Appellant's Brief at 40 (italics in original) (quoting ***Small***, 189 A.3d at 974 (formatting modified)). Appellant explains:

> This principal is instructive here. While [Appellant] knew generally of the existence of the NFPA 921 at the time of his trial, it is undisputed that none of the investigators relied on it in forming their opinions, and [Appellant] did not present a defense based on it. Moreover, [**Appellant] did not have, and could not have had, knowledge of the important changes in fire investigation methodology applicable to this case** that occurred in the ensuing decades—**the most significant of which did not come about until the publication of the 2021 edition of the NFPA 921**….

Appellant's Brief at 40-41 (emphasis added).

Appellant claims the PCRA court "ignored the Supreme Court's instruction that evidence can be new and non-cumulative for purposes of the

PCRA if it is of a different and 'higher' grade or character," even if it is "upon

the same point" as presented at trial. *Id.* at 41 (citation omitted).

In rejecting Appellant's claims, the PCRA court concluded:

> **[Appellant's] knowledge of the NFPA 921 itself is the new fact in this case, not Dr. Beyler's report opining on the scientific principles as applied to [Appellant's] case.** As the underlying scientific principles supporting Dr. Beyler's expert opinions and the methodology have existed in the public domain well-before 2017, and the record evidences that [Appellant] was aware of the NFPA 921 since the time of his trial in 1995 or at least in 2002 when he filed his second PCRA Petition, it is the opinion of this [c]ourt that [Appellant] cannot satisfy the first prong of 42 Pa.C.S.A. § 9545(b)(2). *See Commonwealth v. Smallwood*[,] 155 A.3d 1054 (Pa. Super. 2017) and *Commonwealth v. Ward-Green*[,] 141 A.3d 527 (Pa. Super. 2020).

PCRA Court Opinion, 7/26/22, at 6-7 (emphasis added).

The PCRA court specifically found the February 2, 2021 amended

petition was

> untimely filed as **the controlling fact is [Appellant's] knowledge of the NFPA 921, and [Appellant] has been aware of the NFPA 921 well-before** [**the 2021**] **amendment has been filed. Assuming *arguendo* that the 2021 edition of the NFPA constitutes a newly-discovered fact as applied to [Appellant's] case, the [c]ourt finds that the changes are inconsequential as applied to [Appellant's] case at this stage of the proceeding.** The NFPA 921 existed at the time of [Appellant's] trial. The Commonwealth's fire investigator experts did not utilize the scientific method under the NFPA 921 at [Appellant's] trial. The record establishes that [Appellant] was aware of the NFPA 921 at least by the time he filed his second PCRA Petition in 2002. As [Appellant] has raised challenges to the NFPA 921 in his second PCRA Petition and could have raised the failure of the Commonwealth's witnesses to utilize the scientific method under the NFPA 921 in conducting their investigation in this case previously, **the [c]ourt finds that the continued**

**revisions under the NFPA 921 are immaterial to a timeliness determination**.

*Id.* at 7 (emphasis added). After careful review, we cannot agree with the PCRA court, as its conclusions are inconsistent with the record and law.

Appellant presented unrebutted and extensive testimony from Dr. Beyler, whom the parties and PCRA court recognized as an expert in fire investigation and fire science. N.T., 10/25/21, at 66. Appellant summarized Dr. Beyler's expertise:

> [Dr. Beyler] holds several degrees in the fields of fire science and engineering, including B.S. degrees in civil engineering from Cornell University and in fire protection engineering from the University of Maryland, a masters in fire safety engineering from the University of Edinburgh, a masters in mechanical engineering with a focus in combustion from Cornell, and a Ph.D. in engineering science from Harvard University. Since 1990, Dr. Beyler has worked for Hughes and Associates, now known as Jensen Hughes [as Technical Director]. At the time of his testimony, Dr. Beyler was in the process of retiring and had the title of Technical Director Emeritus.
>
> [T]hroughout his career, Dr. Beyler has belonged to numerous organizations and committees in the industry including the International Association of Fire Safety Science, the Society of Fire Protection Engineers, and the National Fire Protection Association. He also served on the committee that was responsible for writing, editing, and updating several editions of NFPA 921 during the late 1990s and early 2000s. The Commonwealth acknowledged and stipulated to Dr. Beyler's "eminent qualifications," and the PCRA court qualified Dr. Beyler as an expert in the fields of fire investigation and fire science.

Appellant's Brief at 25-26 (footnotes and citations to notes of testimony omitted).[4]

As noted, the Commonwealth did not present any witnesses. Conversely,

> Dr. Beyler's unrebutted testimony was that these changes [made in the 2021 NFPA 921] were consequential—indeed, that they were the most significant he had seen since NFPA 921's initial publication. **See** N.T. 10/25/2021, 93. He also pointed to their specific relevance to this case, but … did not specifically address merits issues because questions regarding the consequences of the changes are properly addressed through a merits hearing.

Appellant's Brief at 44-45.

Dr. Beyler testified the 2021 revisions to the NFPA were published "[i]n August of 2020." N.T., 10/25/21, at 83. Appellant filed his amended PCRA petition on February 2, 2021, within one year of the "most significant" changes to the NFPA 921. **See** 42 Pa.C.S.A. § 9545(b)(2), **see also** N.T., 10/25/21, at 89 (Dr. Beyler confirming the 2021 edition included a significant change in fire investigation technology).

In his amended petition, Appellant references the trial testimony of Pennsylvania State Trooper Nicholas Puskar (Trooper Puskar) regarding the fire investigation. Amended Petition, 2/2/21, ¶ 3. Trooper Puskar

> concluded the fire was indeed incendiary after talking to Chief Stape and examining the burn damage in the [h]ouse. Specifically, Trooper Puskar relied on Chief Stape's statement that

---

[4] Dr. Beyler testified that he was a volunteer firefighter between the ages of 16 and 30, but "it was a young man's game." N.T., 10/25/21, at 62.

> the firefighters described the fire as very low-burning with unusually-colored flames. He also observed: "alligatoring," or blistering of wood, on the outside of the couch frame and the bottom of the master bedroom door; low, heavy charring of this door, of the baseboards in and near the stairway, of the center of the stairway, of the landing, and of the coffee table legs; and "pour patterns" on the floor in front of the couch, and from the front door to the landing—all of which suggested to him that an accelerant had been used[.] Trooper Puskar requested that an accelerant-detection canine be brought to the scene to corroborate his findings.

*Id.* (citations to notes of testimony omitted).

Appellant also references the Commonwealth's introduction at trial of canine "alerts" as evidence of accelerant use. *Id.* ¶ 4. Specifically, a canine brought to the scene "alerted" to four locations in the living room (three in front of the couch and one at the front door), "and also 'passively' alerted to one location in the upstairs master bedroom." *Id.* The canine did not "alert" at the bottom of the stairs or on the staircase. *Id.* Appellant emphasizes that the forensic laboratory scientist testified that samples collected throughout the house did **not** test positive for accelerants. *Id.* ¶ 5.

The first edition of the NFPA 921 was published in 1992, just prior to the fire investigation in this case. *Id.* ¶ 15. Appellant reiterates that the 2021 edition of the NFPA 921 "marks some of the most substantial changes" since its publication, including significant changes to the processes for investigation of fire origins and the use of accelerant-detecting canines. *Id.* ¶ 19. Appellant claims the changes published in the 2021 NFPA 921, "completely undercut the

validity of the two main areas of fire investigation used in this case – burn pattern analysis and canine accelerant detection." *Id.* ¶ 20. He explained:

> "[T]he analysis process for fire patterns," which were relied on heavily as indicators of arson in the 1993 investigation, "was completely changed." Now, **and for the first time**, NFPA 921 states that hypothesis as to the cause of a fire pattern must be developed by taking into account the dynamics of the fire and the composition of the substance upon which the pattern occurs. Each individual fire pattern requires an individual hypothesis. Then this hypothesis must be tested using the scientific method. This version of the NFPA 921 also introduces an "undetermined" fire pattern for the first time.

*Id.* ¶ 21 (quoting Dr. Beyler's report) (emphasis added).

Further, the 2021 NFPA 921

> cautions that many of the patterns and effects noted by investigators in this fire and presented to the jury as conclusively proving that an accelerant was used have no basis in science. For example:
>
> a. "It is sometimes claimed that the surface appearance of the char […] has some relation to the use of a hydrocarbon accelerant or the rate of fire growth. There is no scientific evidence that such a correlation exists, and the investigator is advised not to claim indications of accelerant or a rapid fire growth rate on the basis of the appearance of the char," *see* NFPA 921 § 6.3.2.11 (2021 ed.);
>
> b. "The term pour pattern implies that a liquid has been poured or otherwise distributed, and therefore, is demonstrative of an intentional act […]. The use of the term pour pattern and reference to the nature of the pattern should be avoided. The correct term for this pattern is an irregularly shaped fire pattern," NFPA 921, § 6.2.30.7.3 (2021 ed).

*Id.* ¶ 22.

Quoting Dr. Beyler's report, Appellant states:

J-S22038-23

These **new fire pattern analysis changes** make the process of pattern analysis used in this fire by investigators obsolete. In fact, the assumptions regarding fire patterns that the investigators relied upon in concluding that the fire was incendiary are no longer allowed under the 2021 edition of the NFPA 921.

*Id.* ¶ 24 (citation omitted, emphasis added).

Regarding canine alerts,

the 2021 version of the NFPA 921 now expressly prohibits [] presenting canine handler alerts as evidence of the presence of an ignitable liquid: "Any canine alert not confirmed by laboratory analysis should not be considered validated and, accordingly, should not be offered as direct or circumstantial evidence of the presence of an ignitable liquid in a criminal or civil trial." NFPA 921 § 17.7.7 (2021 ed.). This is because scientific research shows that canines both alert to products that are not produced by an ignitable liquid and also fail to alert to ignitable liquids. In evidentiary terms, they simply are not reliable evidence. *See* NFPA 921 § 17.7.1.

*Id.* ¶ 25. Appellant emphasizes Dr. Beyler's opinion that "if offered today, Trooper Puskar's trial testimony regarding [the canine's] accelerant detection alerts would not be considered valid evidence under the 2021 edition of the NFPA 921." *Id.* ¶ 26 (citation and quotation marks omitted).

<u>The 1997 Trial</u>

The Commonwealth relied on mostly circumstantial evidence to prove Appellant's guilt. *See* Trial Court Opinion, 12/22/97, at 5 ("Admittedly, a great portion of the Commonwealth's case is based upon circumstantial evidence."). The Commonwealth's case included evidence regarding domestic violence and life insurance policies. *Id.* at 6-7. The Commonwealth also presented evidence that Appellant,

- 14 -

despite being separated from his wife by little more than a pane of glass, did little or nothing to try to rescue her. The fact that the windows, usually left open, were all closed, could be found to indicate [Appellant] wanted no chance for the victims to escape or cry out for help.

*Id.*

The trial court concluded "the unusual flames and flame patterns observed by the firefighters would become extremely significant in light of the expert testimony to follow." *Id.* at 13. According to the trial court, Trooper Puskar

observed low and unusual burn patterns in front of the living room couch; unusual burn patterns in the hardwood floor that led to the front door. He also found unusual burn patterns near the door to the master bedroom where the body of [Appellant's child] was found. No fire damage was found in the kitchen or basement areas. Trooper Puskar opined that some kind of flammable liquid had been used to create the unusual burn patterns he observed….

Trooper Puskar noted that the low burn pattern on the steps to the second floor was consistent with the pouring of accelerant. Normally[,] a chimney-effect burn pattern would be high on the walls[,] as opposed [to] the low burn pattern found on the steps. He found evidence of the pouring of an accelerant right outside the master bedroom.

An accelerant-sniffing dog, Onyx, was called in from Allegheny County to survey the scene. This dog "alerted" in the areas of the living room in front of the sofa and the doorway leading up the steps, as well as outside the master bedroom….

….

Leonard McCoy, a forensic scientist employed by the State Police Crime Lab[,] tested various samples removed from the fire scene. He opined that a highly evaporated gasoline was found in the infant's diaper, although his conclusion was disputed by a defense expert. **No accelerant was found in the floor and carpet samples**….

- 15 -

*Id.* at 17-18 (emphasis added).

<u>The 2021 PCRA Hearing</u>

Appellant testified to learning from one of his attorneys about the 2021 edition of the NFPA 921, and that the significant changes in 2021 were "the basis" for Appellant filing his amended petition.  N.T., 10/25/21, at 13, 17. Appellant acknowledged he previously was aware of the NFPA 921.  *Id.* at 18.

As noted, the parties stipulated to Dr. Beyler being an expert in fire investigation and fire science.  *Id.* at 65-66.  Dr. Beyler testified that the 2021 NFPA 921 is the tenth edition, and "a lot has changed, or a lot has been added."  *Id.* at 70.  He noted the NFPA 921 is "not a static document."  *Id.* According to Dr. Beyler:

> The principal goal [of the NFPA 921 is] to develop and propagate and to practice a scientifically valid, scientifically based fire investigation methodology that included the use of the scientific method and modern fire science, and as an adjunct to that, dispel and remove from practice the myths that had existed previously.

*Id.* at 83.  Dr. Beyler explained the NFPA 921 is

> updated every three years, and not all editions change equally, the science moves forward, the practice of investigation moves forward, and the significance of new editions, while all are significant, the magnitude of that varies.

*Id.* at 76.

> Regarding the changes to the NFPA 921 over the course of its existence:
>
> Some of the highlights of changes in 921 related to the determination of origin.  I think that was in the late [19]90s where originally the scientific method was put forward as a general methodology in an introductory chapter.  The origin chapter,

which, obviously, is an important one, where the fire started, got its own scientific method that was specifically addressing the question of origin. So that gave a lot more fabric to the use of the scientific method with regard to origin.

The edition after that, maybe two editions after that, the fire cause chapter also had a scientific method flowchart and the accompanying text that gave more fabric to the use of the scientific method for the determination of fire cause.

I think those are two benchmarks along the way….

*Id.* at 76-77.

**2021 Changes to Fire Origin Investigations**

Dr. Beyler expressly testified that origin of fire opinions issued prior to

2021 edition may be invalid:

So there will be cases where the opinion and the scientific basis for those opinions would not be changed, **and there are some where it would be changed.**

….

I can't exclude the possibility that during that time if I went back to each and every investigation I did, that I might find things that satisfied NFPA 921 at the time and I look at it now and say, Oh, that was wrong. That's possible. We know more now. **We didn't recognize all our mistakes then. We are getting better over time.**

*Id.* at 135 (emphasis added).

Dr. Beyler identified changes "of significance" in the 2021 NFPA 921:

One is changes to the general methodology where investigators are instructed to formulate multiple hypotheses. Previously, the general Chapter 4 … made reference to a hypothesis, and the goal there is to assure that investigators formulate all the hypotheses that are generated based on the data and evaluate all those hypotheses, which are often called alternate hypotheses, to

- 17 -

ensure completeness of any determination made of origin caused[.] …

….

Throughout history, the flowchart that the basic chapter had and the accompanying text used the word hypothesis in singular, and to some of us, that was always problematic, but that's the way the document was written and continued to be written. **And today, based on the newest edition, that general methodology has been broadened to instruct fire investigators to develop multiple hypotheses as is suggested by the data.**

….

**That's the first time that it showed up on Chapter 4 in the general methodology as part of the scientific method as 921 used it.**
….

… The fact of the matter is that some investigators would develop only a single hypothesis and test that and wouldn't develop other hypotheses that would arise out of the data, and that was recognized as a problem. And, so, the document was changed and made very specific, that it was the duty of the fire investigators to develop these alternate hypotheses for evaluation.

*Id.* at 85-86 (emphasis added). According to Dr. Beyler, "They are very simple changes, **but they mean a great deal**." *Id.* at 87 (emphasis added).

He expounded:

It is highly important that fire investigators develop **all** hypotheses that arise out of the data and test each of those hypotheses, because one is entitled, under the scientific method, to come to a conclusion about a question if one and only one hypothesis survives testing.

**Well, if you only develop one hypothesis and fail to recognize other alternatives, you might say, my hypothesis has survived the testing process. Well, if there were three**

- 18 -

**other hypotheses that also would survive the hypothesis testing process, you don't have a finding. You have multiple explanations for … what happened, and any one of them could be right.** So you don't have a finding in that regard. It would be regarded as undetermined at that point because you had multiple hypotheses. It would be undetermined if you had multiple hypotheses, it would be undetermined if you had no hypotheses that survived testing. Accepting a finding or a conclusion requires that one-and-only-one hypothesis.

So you can see, given that description of how the scientific method is used, the criticality of creating all of the hypotheses that arise out of the data. **It's just going for singular to plural, but it means a great deal.**

*Id.* at 88-89 (emphasis added).

Dr. Beyler identified the "most important" changes in the 2021 edition.

*Id.* at 93. Referencing Chapter 6, Dr. Beyler testified:

This chapter is entitled *Fire Effects and Fire Patterns*. **The changes to this chapter represent a paradigm shift in how fire patterns are analyzed.**

….

[Q]ualitatively, how fire investigators go about analyzing fire patterns is … just completely different than it was before. Paradigm shifts in science are pretty rare, though we like to assign dates to changes, science sort of moves in other ways. **But every once in a while, you will find something where this is completely new, we [] look at this very differently now, and this chapter is that.**

….

… **This is the most important single change in the NFPA 921 in my view since it was published.**

During its history, fire pattern analysis was left entirely to the personal discretion and judgment of the investigator. A fire investigator would look at damage, a pattern of damage, and say what kind of a pattern it was, how it was caused, and what it

meant without any methodology to guide him in doing so, just sort of … I-know-it-when-I-see-it kind of mentality. It gave the investigators, obviously, total discretion without guidance, really, of how to go about analyzing these patterns….

What this chapter now does is say[] that pattern analysis … instead of the fire investigator using his personal judgment to determine what a fire pattern means, or how it arose, he needs to apply the scientific method to that process, and identify all the different ways that this pattern might have been formulated, test those hypotheses with regard to the case facts and what we know about fire science and determine the meaning and origin of the pattern based on the one interpretation being the one and only one that survives testing. Otherwise, the pattern – and this is a new term of art, we didn't have this before. **A fire pattern was never deemed undetermined before because, as you might imagine, when you tell a fire investigator it is your discretion to determine this fire pattern and call it what you will, they never said they don't know what it is, they always knew what it was.**

**Now with more rigor in the process, the profession is now acknowledged that you can't always determine what a fire pattern means**, and if you apply rigorous methodology vis-à-vis the scientific method, there will be instances where multiple hypotheses survive testing or no hypotheses survive testing in which the conclusion must be that the meaning and origin of this pattern are unknown to the investigator.

*Id.* at 95-96 (emphasis added). Dr. Beyler confirmed the use of "undetermined" as an investigative conclusion regarding a fire pattern is new in the 2021 NPFA 921. *Id.* at 96.

Dr. Beyler testified that Chapter 6 now requires investigators to formulate, "based on fire science, all the different ways a pattern might arise and then test those hypotheses for validity." *Id.* at 98. He stated:

Previously … fire pattern analysis was informal judgment of the investigator, end of story. There's virtually no text of process for doing that. Of course, if you are using your personal

understandings, as it were, without a structured methodology, just using your personal judgment, there isn't much to say. Once you get to a rigorous process, then there's a great deal to say, and that's why this new material exists.

….

… **[T]he interpretation of fire patterns has changed from informal judgments to an application of the scientific method making use of fire dynamics analysis. It's an utter change in how investigators go about understanding the presence and meaning of patterns**.

*Id.* at 99 (emphasis added).

Dr. Beyler testified that fire patterns played an important role in the original investigation in this case. *Id.* at 99-100. He opined that 1993 fire investigation methodology was repudiated in the 2021 edition. *Id.* at 101. He testified:

It would be a different investigation methodology.

….

… [W]ith regard particularly with patterns. **The methodology is utterly different before and after '21. Any report written before '21 looked at in light of the 2021 edition, you know, would no long[er] pass muster.**

*Id.* at 102 (emphasis added).[5]

_____

[5] On cross-examination, Dr. Beyler acknowledged the 2021 edition's statement, "Deviations from these procedures, however, are not necessarily wrong or inferior but need to be justified." *Id.* at 107. He clarified:

The intention is they don't want to write a document that prevents you from doing better things. We want to move forward and do better things. … "[I]f you deviate from the 921, you have to

*(Footnote Continued Next Page)*

Reading from the preface, Dr. Beyler quoted:

**The 2021 edition of the NFPA 921 marks some of the most substantial changes since the original publication of the document.** During this cycle, the committee reviewed extensively the location and structure of fire patterns. After careful review and substantial public comment, the committee decided to relocate the fire pattern text found throughout the NFPA into Chapter 6. Not only did this also result in restructuring and rewrite of Chapter 5, **it also saw the combination of fire patterns and arc mapping as a single process of origin determination.**

*Id.* at 128-29 (emphasis added).

He explained:

Arc mapping is when fire attacks a circuit, that is wires and what have you, it does damage to the insulation, and that will cause shorting across conductors that don't have proper insulation anymore. That gives rise to arcs, which gives rise to, for instance, beads and gouges on the wire where the spark issued. Those are electrical artifacts. We call them electrical activity, it was arcing there.

So you do an inventory of where those arcs occurred and recognize that arcing process will ultimately cause the circuit breaker to operate. It won't, necessarily, right away, but at some point it will. So you will be able to identify that when certain parts of the critical circuit were attacked by fire, the circuit was still active. And other parts of the circuit that were attacked after the circuit breaker operated, obviously, we will have no arcing because there's no power anymore. So that can be used as an additional means to help you identify the origin of the fire.

_____

identify that you deviated and give the explanation in your report as to why and how you deviated so that others can judge the suitability of the deviation you have chosen to employ.

*Id.*

*Id.* at 129-30.

Dr. Beyler distinguished the 2021 changes, stating that

fire pattern analysis now, unlike before, is accomplished through the application of the scientific method **in a specific way** identified in Section 6.1 whereby data is collected, hypotheses are formulated as to how and why those patterns came to exist and are tested through hypothesis testing to include fire dynamics analysis to determine if one and only one of those interpretations survives hypothesis testing, in which case, and only in that case, would you be able to attribute a pattern as having a meaning, that is, having fire dynamic meaning beneath them.

**Prior to this edition, it was simply an investigator saw a pattern, made an informal judgment as to what it meant, and moved on.**

*Id.* at 144-45 (emphasis added).

So, fire pattern analysis really was the last place where 921 had allowed investigators simply to make informal judgment about what data meant; otherwise, there is a methodology to be followed which brings with it rigor and transparency. **The area of fire pattern analysis was an outlier in that it was opaque, personal, and didn't follow any particular methodology. <u>This edition changed that</u>. It brought pattern analysis into line with how other things are done in 921** and in some sense, you never say anything is done, but **in a real meaningful way, it completed the transition to the scientific method.**

*Id.* at 145-46 (emphasis added).

With the 2021 changes, Dr. Beyler concluded:

You would not be able to, under the new edition of 921, identify from patterns alone that a fire involved the use of an ignitable liquid.

*Id.* at 146. In his unrebutted testimony, Dr. Beyler stated that the 2021 NFPA

921 represented "**a paradigm shift.**" *Id.* at 146-47 (emphasis added).

**2021 Changes to Canine Alerts**

Dr. Beyler also testified that in the 2021 NFPA 921 Section 17.5.1: "New text [was] formulated for this edition that had not been present before," and called for "trained and certified canine teams." *Id.* at 90. He described the change as significant because:

> [T]he instruction to use canine teams in a non-biasing way such that you are not only using it when you suspect ignitable liquids or only in areas that you suspect ignitable liquids, the text makes it clear that you are to avoid bias through that kind of cherry picking ….
>
> … fire investigators should not put forward canine alerts as evidence if it's not validated by a chemical analysis using approved scientific methodologies, which amounts to it's the chemist who is testifying, it's the chemist who is creating the reliable scientific data. It's not the dog that's creating the reliable scientific data.

*Id.* at 141. Dr. Beyler stated that for the first time in 2021, the NFPA 921, "said that **fire investigators should not put forward canine alerts as evidence**." *Id.* at 91 (emphasis added). He explained:

> The idea that if you have a canine alert, that you should confirm that via a laboratory analysis by a chemist, using scientific methodology, of course, has existed in the document for some time. **The requirement that fire investigators not put forward the canine alert <u>as evidence</u> is new to this edition.**

*Id.* at 92 (emphasis added).

<u>The PCRA Court Opinion</u>

Dr. Beyler's testimony was lengthy and technical. *See* N.T., 10/25/21, 60-149. In contrast, the PCRA court explained its rejection of Appellant's newly-discovered facts claim summarily, stating:

> [T]he amendment is untimely filed as the controlling fact is [Appellant's] knowledge of the NFPA 921, and [Appellant] has

- 24 -

been aware of the NFPA 921 well-before [the 2021] amendment has been filed. Assuming *arguendo* that the 2021 edition of the NFPA constitutes a newly-discovered fact as applied to [Appellant's] case, the [c]ourt finds that the changes are inconsequential as applied to [Appellant's] case at this stage of the proceeding. The NFPA 921 existed at the time of [Appellant's] trial. The Commonwealth's fire investigator experts did not utilize the scientific method under the NFPA 921 at [Appellant's] trial. The record establishes that [Appellant] was aware of the NFPA 921 at least by the time he filed his second PCRA Petition in 2002.

PCRA Court Opinion, 7/26/22, at 7.

The PCRA court cites this Court's decision in **Smallwood**. Letitia Smallwood (Smallwood) was convicted of arson and first-degree murder in 1973. **Smallwood**, 155 A.3d at 1057. Forty years later, in 2014, Smallwood sought PCRA relief based on newly-discovered facts. **Id.** Smallwood relied on an expert's opinion that the Commonwealth failed to prove arson under the NFPA. **Id.** This Court rejected Smallwood's claim, stating:

> **The NFPA 921 standard is the new fact in this case.** As such, Smallwood had to demonstrate the standard was unknown to her and could not have been ascertained by the exercise of due diligence any earlier than 60 days before she filed her second PCRA petition. She has not demonstrated this; instead, the record reveals that after learning of NFPA 921 in 1999, Smallwood spent immense time and effort over the next fifteen years attempting to find evidence of the construction of the subject building so that her expert could offer an alternative theory as to the cause of the fire. If successful, an alternative theory would call into question -- and eliminate -- arson as a credible conclusion using the scientific method under NFPA 921. **Of significance here, however, is that Smallwood did not have to establish an alternative theory for purposes of overcoming the timeliness exception; she simply needed to establish that application of the scientific method under NFPA 921 would lead to the conclusion that the cause of the fire in this case was undetermined.**

*Id.* at 1063 (emphasis added).  We explained:

> The NFPA was revised in 1995, 1998, 2001, 2004, 2008, 2011 and, most recently, in December 2013 (the 2014 edition).  **It is critical to Smallwood's claim that she prove the science was evolving, and that what [her trial expert] could testify to in 2014 was significantly different from that which [her PCRA expert] could testify to in 1999.**

*Id.* at 1068 (emphasis added).  Thus, this Court concluded:

> **[T]he NFPA has been continually updated on a three-year cycle, but the basic premise, the use of the "scientific method," <u>has remain unchanged</u>.**  The essence of [the expert's] affidavit] is that there is no indication that [the investigator] used the scientific method in his fire investigation, and, consequently, two other causes of the fire, accidental and electrical, had not been ruled out.  **[The expert] does not explain how revisions to NFPA 921 subsequent to 1992 changed the use of the scientific method to alter his basic premise that under NFPA 921 the cause of the fire had to be considered undetermined**.  [The expert's] affidavit discussing the use of the scientific method over a dozen years after Smallwood became aware of it does nothing more than introduce facts previously known but now presented through a newly discovered source – [the expert].  If we were to accept Smallwood's position that [the expert's] affidavit constitutes the "new fact" to trigger the timeliness exception, petitioners could endlessly file petitions by producing "new facts" through new sources.

*Id.* at 1069.  We opined:

> What remains incomprehensible is why Smallwood, who clearly knew about the advancements in fire science as early as 1999, waited until March 14, 2014, to file a petition for post-conviction relief based upon this new fact.  **Even her own expert opines that the 2014 version of the NFPA is a refinement rather than a revision of the 1992 NFPA, so the fact relied upon by Smallwood was in the public domain as early as 1992 and Smallwood knew of it in 1999.**  Smallwood did not file her petition within 60 days of the 1999 occurrence.  Our focus is not on the date the expert published his opinion, but on the petitioner's "reasonable efforts" to bring forth the newly-discovered fact of the NFPA 921 standards based on the

information that was publicly available and accessible to her, and any number of experts, for years.

*Id.* at 1070 (emphasis added).

The facts of **Smallwood** are distinguishable because the changes to the 2021 edition of the NFPA 921 were significant and previously unknown to Appellant, who exercised due diligence in presenting them in his amended PCRA petition. In the same year it decided **Smallwood**, our Supreme Court also decided **Commonwealth v. Chmiel**, 173 A.3d 617 (Pa. 2017). In **Chmiel**, the petitioner asserted his conviction and death sentence relied heavily on a forensic expert's presentation of an FBI-approved method of microscopic hair analysis. *Id.* at 619. The expert, a state police forensic examiner, opined at the petitioner's 2002 trial that hair found at the crime scene was "microscopically similar to" the petitioner's hair. *Id.* However, in a 2015 press release, the FBI rejected this scientific method of hair analysis as erroneous in the vast majority of cases. *Id.* Recognizing that his petition was untimely, the petitioner invoked the newly-discovered fact exception to the PCRA's time bar. *Id.* at 621.

The Pennsylvania Supreme Court agreed the petitioner established newly-discovered facts, explaining:

> There are two newly discovered facts upon which [the petitioner's] underlying claim is predicated, both of which were made public for the first time in the Washington Post article and the FBI press release. First, the FBI publicly admitted that the testimony and statements provided by its analysts about microscopic hair comparison analysis were erroneous in the vast majority of cases. The FBI's revelation reverberated throughout the country,

marking a "watershed in one of the country's largest forensic scandals," … precisely because it constituted a public admission by the government agency that had propounded the widespread use of such scientifically flawed testimony. **The revelation was the first time the FBI acknowledged that its microscopic hair analysts committed widespread, systemic error by grossly exaggerating the significance of their data in criminal trials.** … Second, the FBI press release included the revelation that the FBI had trained many state and local analysts to provide the same scientifically flawed opinions in state criminal trials.

**With these newly discovered, material facts, the FBI press release indicates that [the expert's] trial testimony may have exceeded the limits of science and overstated to the jury the significance of the microscopic hair analysis.** [The trial expert] used microscopic hair analysis in an attempt to link [the petitioner] to the crime. The FBI now has publicly repudiated the use of microscopic hair analysis to "link a criminal defendant to a crime." … The FBI's repudiation and disclosure about its role in training state and local forensic examiners satisfies Section 9545(b)(1)(ii), and entitles [petitioner] to a merits determination of his underlying claim.

*Id.* at 625-26 (emphasis added).

Appellant cites **Eric Eugene Small** for the proposition that new evidence "of a different and higher grade or character" may be sufficient to warrant a new trial. Appellant's Brief at 40 (citation omitted). As noted, the Pennsylvania Supreme Court addressed whether the evidence was "cumulative" and therefore not "after-discovered evidence."[6] **Small**, 189 A.3d

---

[6] Distinct from newly-discovered facts, a petitioner claiming after-discovered evidence must demonstrating that the evidence:

(1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely

*(Footnote Continued Next Page)*

at 974. The Court explained after-discovered evidence is insufficient to merit

relief if

> it is of the same character and to the same material point as evidence already adduced at trial. It is clear the terms "of the same character" and "to the same point" refer to distinct qualities of evidence; to be "merely corroborative or cumulative," newly discovered evidence must tend to prove material facts that were already in evidence at trial, and also be of the same grade or character of evidence as that produced at the trial to prove those material facts. **If the new evidence is of a different and "higher" grade or character, though upon the same point, or of the same grade or character on a different point, it is not "merely" corroborative or cumulative**, **and may support the grant of a new trial based on after-discovered evidence.**

***Id.*** (citations omitted, emphasis added).

After careful consideration, we conclude the newly-discovered facts in

this case fall between the "refinements" to the NFPA 921 in ***Smallwood***, and

the "watershed" scandal in ***Chmiel***. We disagree with the PCRA court's

emphasis on the NFPA 921's existence at the time of trial, and its cursory

conclusion that the changes in the 2021 NFPA 921 "are inconsequential as

applied to [Appellant's] case at this stage of the proceeding." PCRA Court

Opinion, 7/26/22, at 7. We cannot reconcile this statement with the record

and law. ***See, e.g., Burton***, 158 A.3d at 629 (reiterating "a petitioner need

---

> corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted.

***Small***, 189 A.3d at 972 (citation omitted).

only establish that the facts upon which the claim is based were unknown to him and could not have been ascertained by the exercise of due diligence.").

Conclusion

The 2021 NFPA 921 was published in August 2020. N.T., 10/25/21, at 83. After learning of the changes from one of his attorneys, Appellant filed his amended PCRA petition, with Dr. Beyler's amended expert report, on February 2, 2021. Dr. Beyler testified the changes significantly impacted fire pattern analysis, canine accelerant detection, and hypotheses development. *Id.* at 85-100. The changes are indicative of a "paradigm shift" altering the scientific methodology for determining fire origin, including the development of multiple hypotheses as to each fire pattern and the inclusion of arc patterns as part of an investigator's fire pattern analysis, and recommend against canine alerts as evidence of accelerants. *Id.* The 2021 changes implicate evidence presented at Appellant's trial, and deviate from prior editions of the NFPA 921. We thus conclude that Appellant has established newly-discovered facts to confer jurisdiction with the PCRA court, and is entitled to a "merits determination of his underlying claim" of innocence. *Chmiel* 173 A.3d 626.[7]

---

[7] We do not hold that the 2021 NFPA 921 establishes newly-discovered facts in all cases involving fire science. *See Smallwood, supra*. Our holding is specific to this record, including Appellant's amended petition and notes of testimony from the October 25, 2021 hearing, as well as applicable legal authority.

Accordingly, we vacate the PCRA court's order and remand for further proceedings.[8]

Order vacated. Case remanded. Jurisdiction relinquished.

Judgment Entered.

*[signature]*

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/16/2023

---

[8] Given this disposition, we do not address Appellant's remaining issues. However, regarding Appellant's fourth issue, we observe that the Pennsylvania Supreme Court has overruled **Edmiston**, in part. **See Elwood Small**, 238 A.3d at 1286 ("[W]e disavow the public record presumption. To the extent that earlier decisions, including our own, relied upon and applied that presumption to reject a petitioner's claim, they now are overruled.").